UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
THE CITY OF NEW YORK,

                      Plaintiff,

             -against-

PATIO DELIVERY, INC. d/b/a MOTOCLICK,
and JUAN PABLO SALINAS SALEK,

                   Defendants.
------------------------------------------------------------------------x

Case No,
26-CV-01287(VSB)(SDA)

**DEFENDANT MOTOCLICK'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION TO
DISMISS COUNTERCLAIMS**

Cyruli Shanks & Zizmor, LLP
420 Lexington Avenue, Suite 2320
New York, NY 10170
(212) 661-6800
Attorneys for Defendant Patio
Delivery, Inc.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **I.** | **INTRODUCTION** | 1 |
| **II.** | **BACKGROUND FACTS** | 1 |
| **III** | **ARGUMENT** | |
| | A. The Motion to Dismiss Standard | 7 |
| | B. Civil Rights Law §74 Privilege Does Not Apply to Plaintiff's Statements | 8 |
| | C. The First Counterclaim Properly Sets Forth a Cause of Action for Violation of Defendant's Substantive Due Process Rights | 15 |
| | D. The Second Counterclaim Properly Sets Forth a Cause of Action for Violation of Defendant's Substantive Due Process Rights | 17 |
| | E. If Plaintiff's Motion is Granted Defendant Should be Granted Leave to Amend | 19 |
| **IV.** | **CONCLUSION** | 19 |

## TABLE OF CASES AND STATUTES

### *Cases*

*Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)* ……………………………………. 7

*Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)* ………………………………. 7

*Bursac v Suozzi*, 22 Misc 3d 328
  (Sup. Ct. Nassau Cnty. 2008) .......……..………………………..…… 16

*Cholowsky v Civiletti*, 69 AD3d 110, 114 (2009…..……………………………. 10, 13

*Conn. Dep't of Pub. Safety v. Doe, 538 U.S.* 1, 6-7,
  123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003). …………………………….…… 15

*Corporate Training Unlimited v. National Broadcasting Co.*,
  868 F. Supp. 501, 509 (E.D.N.Y. 1994)…………………………………………. 13

*County of Sacramento v. Lewis*,
  523 U.S. 833, 847 n. 8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)…………. 17

*Doe v. Dep't of Pub. Safety ex rel. Lee*,
271 F.3d 38, 47 (2d Cir. 2001) …………………………………………. 15

*Fine v. ESPN*, Inc., 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014)……………..…… 13

*Freeze Right Refrig. & A.C. Servs. v. City of New York*,
  101 A.D.2d 175, 184 (1st Dep't 1984) ………………………..……………… 11

*Jackson Nat. Life Ins. v. Merrill Lynch & Co.*,
32 F.3d 697, 699-700 (2d Cir.1994)…………………………………………. 7

*Johnson v. Newburgh Enlarged Sch. Dist.*,
  239 F.3d 246, 252 (2d Cir. 2001) ……………………………………..…… 18

*Liberman v Gelstein*, 80 NY2d 429, 435 (1992) ………………………………. 14

*Martin v. Daily News L.P.*, 121 A.D.3d 90, 101 (1st Dep't 2014) …………….. 10

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) …….. 19

*Paul v Davis*, 424 U.S. at 701-02, 710-11, 96 S. Ct. 1155) …………………… 15

*Rivera v. Greenberg,*
  243 A.D.2d 697, 698 (2d Dep't 1997) …………………………………....    11

*Rufeh v Schwartz*, 50 AD3d 1002, 1004 (2nd Dept 2008)………………………….    14

*Schaffran v. Press Publ. Co.,*
  258 N.Y. 207, 210 (1932)……………………….………………………....    11

*Wexler v. Allegion* (UK) Ltd.,
  374 F. Supp. 3d 302, 314 (S.D.N.Y. 2019)   …………………………………....    13

**Statutes**

24 U.S.C. 1983……………………………………………………………..    1, 7, 8,
                                                                      15, 17

New York Civil Rights Law § 74………………………………………..    1, 8, 7,
                                                                         10

Fed. R. Civ. P. 12(b)(6)    8, 17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
THE CITY OF NEW YORK,

                      Plaintiff,

                                       Case No,
        -against-                    26-CV-01287(VSB)(SDA)

PATIO DELIVERY, INC. d/b/a MOTOCLICK,
and JUAN PABLO SALINAS SALEK,

                      Defendants.
------------------------------------------------------------------------x

### DEFENDANT MOTOCLICK'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO DISMISS COUNTERCLAIMS

### I. INTRODUCTION

Defendant Patio Delivery, Inc. d/b/a Motoclick ("Defendant" or "Motoclick") submits this Memorandum of Law in Opposition to Plaintiff's Motion to Dismiss Defendant's Counterclaims. As will be demonstrated herein, Defendant's First and Second Counterclaims properly plead claims under 24 U.S.C. 1983 for violations of Defendant's procedural due process and substantive due process rights. Additionally, Defendant's Third Counterclaim properly sets forth a cause of action for defamation *per se* under New York law and Plaintiff's claimed affirmative defense under the New York Civil Rights Law § 74 "fair and accurate" reporting privilege does not shield Plaintiff from liability for the defamatory statements made by its officials. Therefore, Plaintiff's motion should be denied in its entirety.

### II. BACKGROUND FACTS

Defendant Motoclick operates a restaurant delivery service in several U.S. cities including New York City. Unlike better known companies in the food delivery industry

such as DoorDash and Uber Eats, Motoclick does not have a consumer facing ordering app. Rather, Motoclick handles only the delivery portion of restaurant food orders. To provide its delivery services, Motoclick contracts with independent delivery drivers who are given access to Motoclick's smart phone app. Via the app, drivers are offered specific delivery tasks on a continual basis. Drivers then have the option to accept the delivery task (and head towards the restaurant to pick up the order) or turn it down. ¶ 3, Chapparo Decl.

Motoclick has two different groups of customers. The first group are restaurants which contract with Motoclick to act as their outsourced delivery service. These restaurants send delivery requests to Motoclick via a private website. Motoclick then funnels the delivery tasks to its network of independent drivers as described above. ¶ 4, Chapparo Decl. The second group of customers are other companies in the food delivery industry which will use a third-party marketplace to hire Motoclick to complete specific food deliveries when they do not have their own delivery driver available. This kind of transaction takes place in real time, through a computer interface without any human involvement. ¶ 5, Chapparo Decl.

Motoclick is just one of several number of delivery-only companies handling delivery for the consumer facing ordering apps. As a result of this real time electronic marketplace for food delivery, when a food order arrives, the consumer is unaware of whether the driver works for DoorDash, Motoclick or one of its competitors. ¶ 7, Chapparo Decl. Motoclick is a minor player in the NYC food delivery market and estimates that it delivers less than two percent (2%) of all the food delivery orders in New York City. ¶ 11, Chapparo Decl.

2

**The Press Release**

This action was originally filed by Plaintiff in the Supreme Court of the State of New York on January 15, 2026. On that same day, Plaintiff issued a press release entitled "New Era of Accountability: Mamdani Administration's DCWP Sues Motoclick and CEO, Warns Delivery Apps to Comply With Worker Protections" (the "Press Release"). A copy of the Press Release is attached as Exhibit A to the Declaration of Paul Goodman.

The Press Release was posted on Plaintiff's www.nyc.gov website and was widely disseminated. A Google search on the search terms "Motoclick NYC Lawsuit" shows that dozens of news organizations published articles based upon the Press Release, including the following:

| | |
|---|---|
| The New York Times | The Washington Post |
| ABC7 New York | Bloomberg News |
| News 12 New York | PIX11 |
| AM New York | 1010 WINS |
| Crain's New York | The Nation |
| Spectrum News NY1 | The National Law Review |
| Insurance Journal | The Washington Examiner |
| Claims Journal | Yahoo News |
| VitalLaw.com | The Times of India |

¶8, Goodman Decl.

The Press Release contains numerous statements about Defendant Motoclick that are either not factual or which wildly exaggerate the actual facts. The Press Release also includes statements which are seemingly intended to use this action as a warning to other food delivery companies. Statements made in the Press Release, with emphasis added as shown, include:

> "DCWP estimates that Motoclick and CEO Juan Pablo Salinas Salek <u>owe workers millions in stolen pay</u> and damages and seeks to shut the company down completely."

"Motoclick and its CEO <u>tricked New Yorkers into working for their platform with false promises and then stole their tips and earnings</u> – sometimes even driving workers into debt."

"Commissioner Levine also <u>today launched a compliance blitz, sending notices to Instacart, DoorDash, Grubhub, Uber, and others</u> warning them to adhere to new Delivery Worker Laws taking effect on January 26."

"This moment marks a new era of co-enforcement in the app delivery industry: rooted in worker leadership, public accountability, and real consequences for reckless app companies."

"We are seeking to shutdown this company"

**The Press Event**

Also, on January 15, 2026, Plaintiff held a press event to announce the filing of the New York State Complaint. The event was done in coordination with two non-City workers rights organizations – Worker's Justice Project and Los Deliveristas Unidos (the "Press Event").

A 31-minute video recording of the Press Event was published by Plaintiff on Plaintiff's NYC Mayor's Office YouTube channel under the title "Mayor Mamdani Announces New Enforcement Actions Against Predatory Delivery Apps." Goodman Decl. Ex. B. As of the date of this Memorandum, the video had been viewed at least 41,854 times. A transcript of the Press Event, as automatically produced by YouTube, is attached as Exhibit B to the Declaration of Paul Goodman.

At the Press Event, three high ranking NYC officials, Mayor Zohran Mamdani, DWCP Commissioner Sam Levine and Deputy Mayor for Economic Justice Julie Su, speaking with the imprimatur of the NYC government, announced that a lawsuit had been filed against Defendant. They then proceeded to make a wide range of accusations and demonstrably false statements about Defendant. They were followed by additional

4

speakers from the Worker's Justice Project and Los Deliveristas Unidos, who acting in partnership with Plaintiff, made additional defamatory and demonstrably false statements about Defendant.

Included in the statements made at the Press Event, with emphasis added as shown, are:

> "Today's lawsuit against Motoclick is not just an action against one company, it's a warning to every app-based company from this Administration. <u>You cannot treat workers like they are expendable and get away with it</u>. We will seek full back pay and damages. We will seek full accountability."
> (Goodman Decl. Ex. C at 11:49)

> "And just two hours ago, DCWP filed a lawsuit against Moto Click, a restaurant-facing app that brazenly ignored the minimum pay rate <u>and stole pay and tips from workers, robbing them of millions of dollars</u>."
> (Goodman Decl. Ex. C at 14:41)

> "Today's lawsuit against Motoclick is not just an action against one company, <u>it's a warning to every app-based company</u> from this Administration."
> (Goodman Decl. Ex. C at 11:35)

> "Today is also about the lawsuit that has been uh put in place in regards to MotoClick. And what we were saying, what we also just heard is about a company that didn't <u>just deny workers tips in the manner of the more than half a billion dollars</u> that we spoke of earlier, <u>but also charged these workers, often times stole money from these workers</u>, refused to abide by minimum pay rates for these workers"
> (Goodman Decl. Ex. C at 22:13)

> "What New Yorkers deserve is a DCWP that is just as relentless in its pursuit of justice and its pursuit of fairness as companies like MotoClick are <u>in their pursuit of illegality</u>"
> (Goodman Decl. Ex. C at 23:14)

> "The era of <u>predatory apps raking in billions of dollars off the backs of workers and consumers is over</u>"
> (Goodman Decl. Ex. C at 12:12)

> "We are not only suing MotoClick seeking full pay and damages for the <u>workers they cheated</u>, but we're suing the company's CEO. "
> (Goodman Decl. Ex. C at 15:20)

5

"No executive should be <u>exploiting workers to line their own pockets</u>"
(Goodman Decl. Ex. C at 15:28)

"The <u>era of predatory companies</u>, as the deputy mayor said, <u>raking in billions off the backs of workers</u> and consumers is over, and not a moment too soon"
(Goodman Decl. Ex. C at 15:36)

"I will never stay silent when I see injustice, especially what is happening right now with Moto Click. <u>Motoclick steals wage</u>, ignores minimum pay low and <u>treats workers like disposable machines while hiding behind an algorithm</u>. "
(Goodman Decl. Ex. C at 18:46)

Among other statements made by speakers at the Press Event, all in coordination with the Plaintiff, with emphasis added as shown, were:

"we are <u>bringing the deliverista power into city hall</u> and <u>we are going to be unstoppable</u>"
(Goodman Decl. Ex. C at 17:50)

"<u>Who has the power? We got the power</u>. What kind of power? power. What kind of power?"
(Goodman Decl. Ex. C at 20:08)

"The days of <u>unchecked exploitation are over</u>, right? A <u>new era of worker power has already began. And what a way to show it</u>"
(Goodman Decl. Ex. C at 2:46)

"They are about these policies is about making sure that the deliveristas gets home safe to their families. It's about that they can pay rent. that can put food in the table can live with dignity because for too long <u>multi-billion dollar corporations have treated those deliveristas as disposable</u>"
(Goodman Decl. Ex. C at 6:29)

"We have the deliverista power and <u>we have a mayor from day one and from his campaign has already committed that he's going to give the deliveristas a seat at the table</u>"
(Goodman Decl. Ex. C at 6:55)

**The Social Media Posts**

Plaintiff then amplified its demonstrably false statements about Defendant by conducting a social media campaign consisting of posts made on the major social media platforms accusing Defendant of committing crimes (the "Social Media Posts")

(collectively, the Social Media Posts together with the statements made in the Press Release and at the Press Event shall be referred to herein as "Plaintiff's Public Statements"). The Social Media Posts, all made by City officials, included the following (capitalization shown as included in posts):

> "Motoclick and its CEO tricked New Yorkers into working for their platform with false promises and then STOLE their tips and earnings." – DCWP Facebook post. Goodman Decl. Ex. D

> "Motoclick and its CEO tricked New Yorkers into working for their platform with false promises and then STOLE their tips and earnings." – DCWP Instagram post. Goodman Decl. Ex. E

### III. ARGUMENT

**A.    The Motion to Dismiss Standard.**

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief, requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." It is well settled that a plaintiff must plead just enough facts in the complaint to state a claim that is "plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff (or, in the instant case, Defendant as counterclaim-plaintiff) pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotation marks omitted). Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly* 550 U.S at 555-556.

In considering the motion, the court must take "as true the facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Jackson Nat. Life*

7

*Ins. v. Merrill Lynch & Co.,* 32 F.3d 697, 699-700 (2d Cir.1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of a cause of action.

Herein, the three Counterclaims properly set forth causes of action under Fed. R. Civ. P. 12(b)(6) as the factual allegations, if assumed as true, as a matter of law, will lead to relief under 24 U.S.C. 1983 and New York common law.

**B.     Civil Rights Law §74 Privilege Does Not Apply to Plaintiff's Statements**

Plaintiff seeks to dismiss the Third Counterclaim by contending that all the Plaintiff's Public Statements are privileged under New York Civil Rights Law § 74 ("§ 74") as "fair and accurate" reports of a judicial proceeding. Plaintiff further argues that the Third Counterclaim should also be dismissed because it fails to plead special damages. However, Plaintiff has not established that the Plaintiff's statements are fair and accurate reports of this litigation. Also, since the Plaintiff's Public Statements constitute defamation *per se*, special damages do not need to be alleged.

Defendant does not contend that the Complaint failed to contain disputed allegations concerning withheld tips or earnings. Rather, the issue is that City officials materially transformed and escalated those allegations through a coordinated publicity campaign that repeatedly portrayed Defendant as guilty of criminal and predatory conduct, accused Defendant of stealing "millions" and/or "billions" from workers, threatened to shut down Defendant's operations and warned the entire app-based delivery industry that it has been placed "on notice."

New York Civil Rights Law § 74, known as the "fair report privilege," states that an "action cannot be maintained against any person, firm or corporation, for the

publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published." Defendant contends that the Plaintiff's Public Statements were not a neutral announcement of litigation but were something of an entirely different nature and therefore, the Section 74 privilege does not apply.

While the Press Event commenced with an announcement of the filing of this action, the overall purpose and effect of the Press Event was not to fairly report on the litigation filed two hours earlier, but rather it was a staged public political event designed to advance the new Administration's campaign promises regarding "economic justice." This is established by the fact that the Press Event prominently featured speakers from worker advocacy organizations and delivery-worker activist groups aligned with the Plaintiff's policy objectives, as well as, a purported delivery worker, who spoke as part of the City's economic justice public messaging campaign.

These kinds of speakers are indicia of the Press Event being a political rally and not a mere press announcement of a lawsuit. None of these individuals were speaking about this lawsuit but rather was pushing a worker's rights agenda with chants such as "who has the power."  Further, not a single statement made by the three high ranking NYC officials who spoke at the Press Event (the Mayor, a Deputy Mayor and a City Commissioner) were referred to as allegations made in the Complaint or cautioned that the statements were only allegations of wrongdoing that need to be proven by Plaintiff in court.

The actual political nature of this event is easily shown in the statement made by the City's new Mayor, which contains the sole reference to the Complaint during the entire 31-minute Press Event:

> Today's lawsuit against Motoclick is not just an action against one company. It is a warning to every app-based company from this administration. You cannot treat workers like they are expendable and get away with it. We are also building we're also holding the company's individuals accountable and if needed we will shut down their operation in New York City. If you don't play by New York City's rules you don't get to play in New York City. Let me be clear. The era of predatory apps raking in billions of dollars off the backs of workers and consumers is over. In the Mandani era, compliance with workers rights laws are is not optional. Workers place in city hall and economic justice will mean justice for all.

(Goodman Decl. Ex. C at 11:35)

The privilege afforded by Civil Rights Law §74 is an affirmative defense to a claim of defamation. "It is incumbent on the party asserting the privilege "to establish that the statements at issue reported on a judicial proceeding." *Cholowsky v Civiletti*, 69 AD3d 110, 114 (2009). Plaintiff has not even attempted to meet this burden.

<u>The Published Statements Were Not Accurate</u>

Plaintiff's §74 affirmative defense fails because Plaintiff's Public Statements were not accurate reports of this litigation. The fair reporting privilege requires a determination of whether the publication "provided substantially accurate reporting." *Martin v. Daily News L.P.*, 121 A.D.3d 90, 101 (1st Dep't 2014). While this determination does not mean the language should be "dissected and analyzed with a lexicographer's precision," the privilege does not protect interpretations, expansions, or inaccurate reporting of a proceeding if they create a false and defamatory impression. *Martin*, 121 A.D.3d at 101 (finding that interpretations of a complaint and omissions

10

created a false impression that a judge was mixed up in corruption and thus were not protected by the privilege).

New York courts <u>universally deny application of the §74 privilege</u> when the defamatory statements are not "substantially accurate" accounts of statements made in an official proceeding. *See, e.g.*, *Greenberg*, 155 A.D.3d at 48, 50 (denying application of privilege where the "statements made by [defendant] during the [] interview went beyond" what was said in the complaint and "went beyond merely summarizing or restating" the judicial proceedings); *McRedmond v. Sutton Place Res. & Bar, Inc.*, 48 A.D.3d 258, 259 (1st Dep't 2008) (same, where the defamatory statement was "entirely unrelated to this litigation and cannot be found in the complaint"); *Freeze Right Refrig. & A.C. Servs. v. City of New York*, 101 A.D.2d 175, 184 (1st Dep't 1984) (same, where the defamatory statement was "the product of [the reporter's] own research after learning of the [official proceeding]"); *Schaffran v. Press Publ. Co.*, 258 N.Y. 207, 210 (1932) (same, where the defendant's article implied that the court had found "that [plaintiff] had committed adultery" but that was not what the judge had found); *Rivera v. Greenberg*, 243 A.D.2d 697, 698 (2d Dep't 1997) (same, where defense lawyers announced at a press conference that a police officer sexually assaulted their clients because they were not "a fair and true report of judicial proceedings").

Plaintiff has not established that any of its statements are "substantially accurate" summaries of allegations made in the Complaint. This analysis requires that Plaintiff take each of Plaintiff's Public Statements and show how they repeat the allegations in the Complaint.  The following table compares the allegations contained in the Complaint with a small sampling of statements published by the Plaintiff.

11

**Complaint Allegation**

Defendants also do not pay their workers New York City's minimum pay rate, currently $21.44 per hour. ¶ 1

| Corresponding Public Statements Made By Plaintiff | Speaker / Source |
|---|---|
| Motoclick and its CEO STOLE their tips and earnings." | DCWP Instagram Post |
| Stealing billions from workers. | Speaker at Press Event |
| For too long, companies like Motoclick stole tips from delivery workers and ignored the minimum pay rate law. Under our administration, they won't get away with it any longer. | DCWP Commissioner at Press Event |

**Complaint Allegation**

Defendants have signed workers up to perform deliveries on their app, then proceeded to steal workers' tips and some or all of their earnings from deliveries. ¶ 1

| Corresponding Public Statements Made By Plaintiff | Speaker / Source |
|---|---|
| Motoclick and its CEO tricked New Yorkers into working for their platform with false promises and then stole their tips and earnings – sometimes even driving workers into debt | Press Release |
| Motoclick and its CEO tricked New Yorkers into working for their platform with false promises and then STOLE their tips and earnings. We're fighting back and other predatory delivery apps should be on notice. | DCWP Instagram Post |

**Additional Public Statements Made by Plaintiff Not Matching Any Allegation in Complaint**

| | |
|---|---|
| Today's lawsuit against Moto Click is not just an action against one company. It is a warning to every app-based company from this administration | Deputy Mayor for Economic Justice Julie Su at Press Event |
| "If you scam your workers, we will hold you and your executives accountable." | City Official at Press Event |

| "raking in billions off the backs of workers" | City Official at Press Event |
| "We are seeking to shutdown this company." | Press Release |
| "Other predatory apps should be on notice." | Press Release |

Further, the fair reporting privilege only applies if people watching or reading the publication understood that the defendants were reporting on an official proceeding. *Cholowsky v. Civiletti,* 69 A.D.3d 110, 114 (2d Dep't 2009) ("it is also incumbent on the party asserting the privilege to establish that the statements at issue reported on a 'judicial proceeding'"). The privilege is not applicable if "the context in which the statements are made make 'it impossible for the ordinary viewer [listener or reader] to determine whether the defendant was reporting' on a judicial proceeding . . . ." Id. at 114-15. A defendant's "mere mention of an official proceeding does not automatically extend the privilege to the entire publication." *Fine v. ESPN*, Inc., 11 F. Supp. 3d 209, 217 (N.D.N.Y. 2014). Courts reject application of the fair reporting privilege if people watching or reading the publication would not understand that the defendants were repeating statements made in an official proceeding. *See, e.g., Wexler v. Allegion* (UK) Ltd., 374 F. Supp. 3d 302, 314 (S.D.N.Y. 2019) (rejecting fair reporting privilege where "it is equally unclear whether [counterclaim-defendant's] statements about the broken promise were reporting on the allegations in his lawsuit or making an independent accusation against [counterclaim-plaintiff]"); *Corporate Training Unlimited v. National Broadcasting Co.*, 868 F. Supp. 501, 509 (E.D.N.Y. 1994) (same, where "the way the Broadcast is stylized–as a succession of interviews with participants in the incident– belies the notion that NBC was even attempting to provide a fair and true report of a judicial proceeding").

13

Additionally, New York courts have previously found that "If the statements published taken in context with the entire publication suggests more serious conduct than actually suggested in the official proceeding, then the privilege does not attach as a matter of law" *See Daniel Goldreyer, LTD v Van de Wetering*, 217 AD2d 434, 436 (1st Dept 1995). This is exactly the situation in the instant case. It is respectfully submitted that since none of the statements made by Plaintiff's officials and by the other individuals invited to speak at Plaintiff's behest, made it clear that statements charging Defendant with criminal conduct were just mere allegations, the casual listening or reader would have no way of knowing that statements such as the "Defendant stole millions from workers" were not a pronouncement of adjudicated guilt.

Therefore, Plaintiff's Public Statements are not a fair and accurate report of an official proceeding.

Defendant Does Not Need to Allege Special Damages

Plaintiff further asserts that the Third Counterclaim does not allege special damages and therefore, does not properly state a cause of action for defamation under New York law. However, Plaintiff ignores that its public statements constitute defamation *per se* and therefore, Defendant does not need to show special damages. *Rufeh v Schwartz*, 50 AD3d 1002, 1004 (2nd Dept 2008). Defamation *per se* includes "statements (i) charging plaintiff with a serious crime; [and] (ii) that tend to injure another in his or her trade, business or profession." *Liberman v Gelstein*, 80 NY2d 429, 435 (1992).

There can be no question that Plaintiff's public statements charged Defendant with serious crimes including that Defendant "stole millions of dollars" from workers.

14

Therefore, it is respectfully submitted that the Third Counterclaim properly alleges a cause of action for defamation *per se* and should not be dismissed.

**C.     The First Counterclaim Properly Sets Forth a Cause of Action for Violation of Defendant's Substantive Due Process Rights**

The First Counterclaim properly pleads a cause of action for violation of Defendant's procedural due process rights under 42 U.S.C. § 1983. While Plaintiff attempts to style the First Counterclaim as merely a state law defamation claim, Defendant (as counterclaim plaintiff) has met both prongs of the "stigma plus" test, in that, it has adequately pled harm to its reputation <u>and</u> adequately pled the "plus" deprivation of another legal right

To prevail on a "stigma plus" claim, a plaintiff must show (1) the utterance of a statement "sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false," and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights. *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001) (*citing Pau v Davis*, 424 U.S. at 701-02, 710-11, 96 S. Ct. 1155), *rev'd on other grounds sub nom. Conn. Dep't of Pub. Safety v. Doe, 538 U.S.* 1, 6-7, 123 S. Ct. 1160, 155 L. Ed. 2d 98 (2003).

There is no question that Defendant has been stigmatized by Plaintiff's public statements including that Defendant has committed crimes by stealing millions from workers and that its executives have "pocketed stolen millions."  These elements were properly pleaded in the First Counterclaim as follows:

> 2. Acting under color of state law, on January 15, 2026, Plaintiff through its agency the Department of Consumer and Worker Protection ("DCWP") and the DCWP's Commissioner, publicly issued an official press release entitled "*New Era of Accountability: Mamdani Administration's DCWP Sues Motoclick and CEO, Warns Delivery*

*Apps to Comply With Worker Protections*" accusing Defendant and its CEO of having "stolen" workers' pay, "tricked" workers, engaged in a "scam," and owing "millions in stolen pay."

3. Also on January 15, 2026, Mayor of New York City Zohran Mandami held a press event together with the DCWP Commissioner in which they made additional unfounded and conclusory statements regarding Defendant including that Defendant "stole pay and tips from workers robbing them on millions of dollars" and that the Defendant "cheated" workers.

4. On January 16, 2026, the DCWP posted a video of the January 15, 2026 press event on its Instagram page which included, a written statement that "Motoclick and its CEO tricked New Yorkers into working for their platform with false promises and then STOLE their tips and earnings." The all caps emphasis on the word "stole" is as shown in the Instagram post.

5. These statements accused Defendant of criminal and fraudulent conduct and were false and materially misleading, including the assertion that Defendant stole "millions" of dollars from workers, which never occurred and that Defendant "tricked" workers into working for Defendant, which also never occurred.

6. Plaintiff issued these statements publicly, definitively, and as statements of fact, not as allegations or unproven claims, and did so prior to any adjudication, finding of liability, or opportunity for Defendant to contest the accusations. At no time did Plaintiff indicate that their statements were just allegations that needed to be proven at a trial. Rather, they were stated as if already adjudicated.

Moving on to "plus" prong – the deprivation of a legal right in addition to the defamation – it is alleged in Paragraph 8.

8. As a direct and proximate result of the Plaintiff City's stigmatizing statements and shutdown threats, Defendant suffered tangible and concrete harm, including loss of workers, business relationships, goodwill, and economic opportunity, thereby satisfying the "plus" element required for a stigma-plus claim.

As a matter of law, the nature of Plaintiff's statements about Defendant and the nature of the publication of these statements on the Internet, where they will live forever, establishes the "plus". In the analogous case of *Bursac v Suozzi*, 22 Misc 3d 328 (Sup. Ct.

16

Nassau Cnty. 2008), the New York Supreme Court considered whether the Internet posting of the name, mug shot and identifying information of an individual recently arrested for DWI on Nassau County's "Wall of Shame" website and in a press release, constituted the "plus" needed in a substantive due process claim. The goal of the "Wall of Shame" was described by the county respondent as a way to publicize the names and arrest pictures of "those who break the law by driving drunk" and to "make sure their friends, neighbors and families know about it". The Court therein found that the petitioner's due process rights had been violated and that the nature of the limitless and eternal notoriety, without any controls, was sufficient to be the "plus" in the "stigma plus" due process analysis.

Defendant contends that Plaintiff's Published Statements were designed to punish and delegitimize the Defendant before adjudication are analogous to Nassau County's failed "Wall of Shame," and are sufficient to constitute the "plus" in the "stigma plus" due process analysis. Therefore, the First Counterclaim should not be dismissed.

**D.      The Second Counterclaim Properly Sets Forth a Cause of Action for Violation of Defendant's Substantive Due Process Rights**

The Second Counterclaim properly pleads a cause of action for violation of the Defendant's substantive due process rights under 42 U.S.C. § 1983. While Plaintiff contends that its acts do not constitute the kinds of shocking violations of Defendant's rights necessary to maintain a substantive due process rights claim, Defendant disagrees.

For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, it must allege governmental conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). "`The measure of what is

17

conscience-shocking is no calibrated yard stick.'" *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir. 2001) (*quoting Sacramento*, 523 U.S. at 847, 118 S. Ct. 1708). Nevertheless, "malicious and sadistic" abuses of power by government officials, intended to "oppress or to cause injury" and designed for no legitimate government purpose, "unquestionably shock the conscience." *Id*.

The Second Counterclaim seeks redress for Plaintiff's governmental efforts to economically destroy a company through public condemnation despite lacking regulatory authority over its existence. Added to this, Plaintiff's January 15, 2026 staged public announcements designed to punish and delegitimize Defendant before adjudication, including the Social Media Posts stating, in all caps, that Defendant had "STOLEN" millions of dollars from unsuspecting workers, it becomes clear that Plaintiff's words were absolutely intended to shock the conscience of the viewer and reader. Defendant contends that whether Plaintiff's statements meet this standard is a question for a jury and dismissal upon a motion to dismiss would be premature.

In fact, shocking people in order to further Plaintiff's policy agenda was exactly the purpose of the Press Event and the statements published in various media. Clearly, Plaintiff intended to use the drastic remedies announced as a way to shock Defendant's competitors into compliance, as shown in statements such as "Other predatory apps should be on notice" and "we will hold you and your executives accountable."

Plaintiff's statements are even more shocking since Plaintiff possesses, or is in a position to possess, financial information demonstrating the impossibility of its public accusation of massive theft from workers. Plaintiff, as a taxing entity, could have easily verified Defendant's revenue and expenses before accusing Defendant of stealing

18

millions. This alleged use of sovereign authority and knowingly false public condemnation plausibly constitutes arbitrary and conscience-shocking governmental conduct.

Defendant contends that it shocks the conscience to have public officials make demonstrably false statements, which could never be proven in court, calling a party a criminal in an attempt to destroy its business and therefore, the Second Counterclaim should not be dismissed.

### E.    If Plaintiff's Motion is Granted Defendant Should be Granted Leave to Amend

A plaintiff whose claims are dismissed for failure to state a claim generally must be given leave to file an amended complaint to cure the defective pleading. Under Rule 15(a), "leave to amend 'shall be freely given when justice so requires," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007) (*quoting* Fed.R.Civ.P. 15(a)).

Therefore, if the Court should determine that the causes of action contained in the Counterclaims are not pled with sufficient detail or specificity, it is respectfully submitted that Defendant should be granted leave to amend the Counterclaims to cure any such defects in pleading.

### IV. CONCLUSION

For the reasons set forth herein, Plaintiff's motion should be denied in its entirety. Alternatively, if the Court should determine that the Counterclaims are not pled with sufficient detail or specificity, it is respectfully submitted that Defendant should be granted leave to amend the Counterclaims to cure any such defects in pleading.

19

Dated : New York, New York
        June 9, 2026

CYRULI SHANKS & ZIZMOR LLP

By:_____
            Paul Goodman

Attorneys for Defendant Patio Delivery, Inc.
420 Lexington Avenue
Suite 2320
New York, New York 10170
(212) 661-680

20

## WORD COUNT CERTIFICATION

Pursuant to Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I hereby certify that the total number of words in this memorandum, excluding the caption, table of contents, table of authorities, signature block certificate of service, and this word count certification is 5,464.

_____
PAUL GOODMAN