UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
THE CITY OF NEW YORK,

                          Plaintiff,

                                            Case No,
          -against-                    26-CV-01287(VSB)(SDA)

PATIO DELIVERY, INC. d/b/a MOTOCLICK,
and JUAN PABLO SALINAS SALEK,

                          Defendants.
-------------------------------------------------------------------x

**DEFENDANT MOTOCLICK'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION AND IN SUPPORT OF MOTOCLICK'S CROSS-MOTION**

CYRULI SHANKS & ZIZMOR LLP
Attorneys for Defendant Patio Delivery, Inc.
420 Lexington Avenue
Suite 2320
New York, New York 10170
(212) 661-680

## TABLE OF CONTENTS

I.      INTRODUCTION                                                          1

II.     BACKGROUND FACTS                                                1

III     ARGUMENT

        A.  **PLAINTIFF HAS NOT ESTABLISHED THE REQUIRED**      16
        **ELEMENTS FOR A PRELIMINARY INJUNCTION**

        B.  **PLAINTIFF'S AGGREGATE PAY REQUIREMENT IS**        20
        **UNCONSTITUTIONAL AS APPLIED AND THEREFORE,**
        **PLAINTIFF CANNOT DEMONSTRATE LIKELIHOOD OF**
        **SUCCESS ON THE MERITS AND DEFENDANT'S CROSS-**
        **MOTION SHOULD BE GRANTED**

IV.     CONCLUSION                                                          28

## TABLE OF CASES AND STATUTES

### Cases

*200 E. 84th St. Owners, Inc. v. Salomone & Co.*, No. 89-CV-5035,
  1989 WL 111105, at *2 (S.D.N.Y. Sept. 20, 1989 ………………...……….. 18

*Citibank, N.A. v. Citytrust, 756 F.2d 273*, 276 (2d Cir. 1985)…………………... 19

*Eastern Enterprises v. Apfel, 524 U.S. 498* (1998) ………………………………… 26

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110, 118 (2d Cir. 2009) …………………………………………… 16

*FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313–14 (1993) …….……...……... 24

*Hodgson v. Corning Glass Works,* 474 F.2d 226 at 236-37 (2d Cir.1973),
  *aff'd,* 417 U.S. 188 …..…………………………………………………… 19

*Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595* (2013)……………. 26

*Mathews v. de Castro*, 429 U.S. 181, 185 (1976) ………………………….…… 16

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978) ……………. 26

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*,
  749 F.2d 124, 125-26 (2d Cir. 1984)………………………………………… 27

*Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir. 1970)……….. 27

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)………………………… 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) …………………… 16

### Statutes

6 RCNY § 7-810 …………………………………………………........... 1, 4, 5,
                                                                    6, 20,
                                                                    22

N.Y. Const. art. I, §§ 6, 11) …………………………………………….. 25

U.S. Const. amend. V…………………………………………………...….. 26

U.S. Const. amend. XIV, § 1 …………………………………………...….. 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
THE CITY OF NEW YORK,

                Plaintiff,

                                Case No,
     -against-                     26-CV-01287(VSB)(SDA)

PATIO DELIVERY, INC. d/b/a MOTOCLICK,
and JUAN PABLO SALINAS SALEK,

                Defendants.
------------------------------------------------------------------------x

**DEFENDANT MOTOCLICK'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION AND IN SUPPORT OF MOTOCLICK'S CROSS-MOTION**

### I. INTRODUCTION

Defendant Patio Delivery, Inc. d/b/a Motoclick ("Defendant" or "Motoclick") submits this Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction and in support of its Cross-Motion for a Preliminary Injunction. In its Cross-Motion, Motoclick challenges only the statutory requirement under 6 RCNY § 7-810(b)(2) (which requires Motoclick to pay delivery workers for "on-call time" when they are either not performing services for Motoclick and/or actively working for competitors).

On the very day Plaintiff filed its motion for a preliminary injunction, it issued a press release to announce the filing with the headline "*Mamdani Administration Moves to Protect NYC Workers, Files Motion to Shutter Third-Party Delivery App.*"[1] The release announced that they were seeking an injunction "to stop Patio Delivery, Inc. d/b/a

---

[1] A copy of the June 24, 2026 press release is attached as Exhibit A to the Declaration of Paul Goodman.

Motoclick and its agents from operating in New York City unless they come into compliance" and emphasized that this was "the first time DCWP has sought a preliminary injunction to protect delivery workers."

These public statements, combined with the earlier press conference in which city officials declared their intention to "shut down" Motoclick, demonstrate that the Plaintiff's true intent in seeking this mandatory injunction is not to prevent genuine irreparable harm to delivery workers (as the motion states) but rather to force Motoclick out of business and to further Plaintiff's political agenda. This aggressive posture, aimed at shuttering Motoclick's operations pending resolution of its constitutional challenge, strongly weighs against granting the extraordinary relief requested and supports denial of Plaintiff's motion.

As will be shown herein, Plaintiff's regulation creates an irrational paradox where the dominant competitors in the restaurant delivery industry such DoorDash and Uver Eats are allowed to pay their delivery workers a fixed amount of $36.88 per hour, pro rated to only the actual time they spend engaged in deliveries, while small competitors like Motoclick, are forced to pay $22.13 per hour for the entire time that a delivery worker is logged into Motoclick's platform resulting in much higher compensation costs for Motoclick and other companies which are similarly situated.

## II. BACKGROUND FACTS

In 2024, almost three of every four restaurant orders were not eaten in a restaurant, according to data from the National Restaurant Association. New York Times, *Freedom With a Side of Guilt: How Food Delivery Is Reshaping Mealtime*, February 1, 2026. Defendant Motoclick operates in this market by providing a restaurant delivery

service in several U.S. cities including New York City. Unlike better known companies in the restaurant delivery industry such as DoorDash and Uber Eats, Motoclick does not have a consumer facing ordering app, meaning that consumers cannot order food from Motoclick. Rather, Motoclick handles only the delivery portion of restaurant food orders. To provide its delivery services, Motoclick contracts with independent delivery drivers who are given access to Motoclick's smart phone app (the "Motoclick App"). Once a delivery worker signs into the Motoclick App, they are offered, on a continual basis, delivery tasks. Once offered a delivery task, delivery workers then have an option to accept the delivery task (and head to the restaurant), turn down the delivery task or not respond at all (with the delivery task then offered to another nearby delivery worker signed on to the Motoclick App). ¶ 11, Chapparo Decl.

Motoclick has two different groups of customers. The first group are restaurants which contract with Motoclick to act as their outsourced delivery service. These restaurants send delivery requests to Motoclick via a private website and Motoclick then funnels the delivery tasks to its network of independent drivers as described above. ¶4, Chapparo Decl. Motoclick currently has this kind of relationship with 17 restaurants in New York City. ¶ 5, Chapparo Decl

The second group of customers are the major food ordering apps themselves which use Motoclick as an overflow subcontractor to complete restaurant deliveries when they do not have one of their own delivery workers nearby or when it is more cost efficient for them. ¶7, Chapparo Decl. This kind of transaction takes place in real time, through an third party marketplace without any human involvement. ¶6, Chapparo Decl.

3

Motoclick is just one of several number of small delivery-only companies handling overflow for the large consumer facing ordering apps. As a result of this real time marketplace for restaurant delivery, when am order arrives, even though the order may have been placed through a DoorDash, the consumer is unaware of whether the driver works for DoorDash, Motoclick or one of its competitors. ¶8, Chapparo Decl. Motoclick is a minor player in the NYC restaurant delivery market and estimates that it delivers less than two percent (2%) of all the food delivery orders in New York City. ¶ 9, Chapparo Decl. While it controls only a miniscule portion of the NYC market, Motoclick's NYC operations provide over 90% of its annual revenue. ¶10, Chapparo Decl.

No matter how much Plaintiff tries to characterize this action as a garden variety unpaid wage case like those brought under the Fair Labor Standards Act, it is not. This action is different because Plaintiff's regulation requires more than just an hourly wage being paid. Instead, a delivery company must satisfy each of two separate compensation requirements each month, one of which is not tied to actual work being performed for Motoclick.

**New York City Restaurant Delivery Worker Minimum Wage**

In October 2022, The Department of Consumer and Worker Protection ("DCWP") published a report entitled "*A Minimum Pay Rate for App-Based Restaurant Delivery Workers in NYC*" (the "DCWP Report") which contains a description of the DCWP's rule making efforts and methodology used in enacting the delivery worker minimum wage regulation. 6 RCNY § 7-810. Under New York City's minimum pay regime for app-based restaurant delivery workers, a food delivery platform may satisfy its

4

compensation obligations using either the "Standard Method" or the "Alternative Method." 6 RCNY § 7-810. As explained below, Motoclick does not qualify to utilize the Alternative Method and thus this discussion will focus on the Standard Method. This discussion also excludes tips which need to be paid to the workers in addition to the minimum wage.

The Standard Method

In order to understand the Standard Method it is important to understand the terminology used by Plaintiff. The regulation defines "Trip Time" as the period of time which begins when a worker accepts a delivery task (including preparation, pickup, travel and delivery) and which ends upon completion or cancellation of the order. "On-Call Time" is the time a worker is connected to the platform's system and available to receive or accept delivery offers with a New York City pickup or drop-off location, excluding Trip Time. Combined, Trip Time and On-Call Time equal the total amount of time that a working is logged into a delivery company's platform which we will refer to herein as "Total Log-In Time."

In order to comply with Standard Method, first, a company must satisfy an "individual requirement", meaning that each delivery worker's compensation must at least equal the minimum pay rate multiplied by that worker's total Trip Time (the "Individual Requirement"). 6 RCNY § 7-810(b). Motoclick meets or exceeds this standard. In other words, Motoclick's delivery worker are being paid at least the minimum wage for every minute that they are actively providing services to Motoclick. ¶13, Chapparo Decl.

5

Second, a delivery company must satisfy a so-called "aggregate requirement", under which the total compensation paid collectively to all delivery workers must be at least the minimum pay rate multiplied by the sum of all workers' Trip Time plus On-Call Time. 6 RCNY § 7-810(b)(2).  In other words, as a group, over the course of a month, workers much be collectively paid an amount equal to the total of all Total Log-In Time multiplied by the minimum pay rate (the "Aggregate Requirement"). The Aggregate Requirement applies even if during a delivery worker's On-Call Time he or she may have turned down Motoclick delivery tasks or performing deliveries for competitors. The key difference between the Individual Requirement and the Aggregate Requirement, is that while the Individual Requirement defines the minimum compensation of each delivery worker, the Aggregate Requirement defines the total amount that has to be paid to all workers during a month.

An example would be illustrative. Let's assume that a delivery company has two delivery workers, Worker A and Worker B. Now let's assume that each Worker is logged on to a restaurant delivery company's app for 30 hours a week (his "Total Log-In Time"). Also, let's assume that Worker A's Trip Time for the week was 10 hours (and thus, his On-Call Time was 20 hours), and Worker B's Trip Time for the week was 15 hours (and thus, his On-Call Time was 15 hours). For the sake of simplicity, let's assume that the minimum wage is $22.00 an hour (excluding tips).

Based upon the Individual Requirement, the company is required to pay the workers as follows.

• Worker A is entitled to be paid $220.00 for his 10 hours of Trip Time (10 * $22.00)

• Worker B is entitled to be paid $330.00 for his 15 hours of Trip Time (15 * $22.00)

If a restaurant delivery company has paid the workers these amounts (for a total of $550.00) it would be in compliance with the Individual Requirement.

Now, let's look at the second calculation that needs to be made — the Aggregate Requirement. Because each worker was logged into the company's app for 30 hours, the Aggregate Requirement requires that the delivery company has to pay total compensation of at least $1,320 to be in compliance (60 hours of Total Log-In Time multiplied by $22.00). Since the Individual Requirement requires that the workers only need to be paid a total of $550, to be in compliance with the Aggregate Requirement the company has to pay the workers, as a group, and additional $770. Thus, a company needs to create a pool of funds every month based upon the difference between the aggregate Total Log-In Time of all workers less the amount of payments made under the Individual Requirement (the "Aggregate Pool"). The Individual Requirement allows no set off at all for other compensation received by the workers during the same time period or for situations where the worker chooses not to deliver orders but remains logged into the company's platform.

Even more troubling and puzzling is that the regulation is silent as to who is to receive the money in the Aggregate Pool. This Aggregate Pool is increased by approximately 37 cents for every second that each of Motoclick's delivery workers are connected to the Motoclick App, even if they are not actively in the process of delivering an order for Motoclick. In discussions with counsel for the Plaintiff, it was explained that Plaintiff does not care about who receives the money or the methodology employed to divide those funds among workers. ¶ 3, Goodman Decl, Plaintiff is solely concerned that

7

it is paid to someone. ¶3 Goodman Decl, As a result, the Aggregate Pool could be used as a prize to compensate the worker or workers who performed the most deliveries during a month. ¶3 Goodman Decl, Further, as admitted by Plaintiff, these payments to the Aggregate Pool are required <u>even if a delivery worker is then actively being paid by a competitor.</u>

The amount of the Aggregate Pool increases rapidly and at a rate which will quickly drive a small restaurant delivery company such as Motoclick out of business. For example, if 50 delivery workers are logged in to the Motoclick App at the same time, the Aggregate Pool is increased by approximately $18 a minute, or approximately $1,100 an hour, whether any deliveries are being made or not. As stated, this Aggregate Pool can be distributed by Motoclick in any way it desired even if it distributed arbitrarily or to just one worker. To place the economics in perspective, Motoclick only receives an average of $6.00 per delivery from restaurants or other platforms. ¶18, Chapparo Decl. Out of that $6.00, the company has to pay the delivery worker, a minimum of $0.37 per minute of active time (time spent biking to the restaurant, waiting for the food and then biking to the customer). Motoclick records show that the average active time per delivery is 9.7 minutes and the average distance is just 1.2 miles. ¶15, Chapparo Decl Thus, on the average, a delivery worker is paid at $3.60 per delivery (plus tips), leaving Motoclick with a gross profit of no more than $2.40 per delivery. Thus, if the delivery worker then turns down orders over the next six minutes, Motoclick's entire gross profit for the delivery needs to be paid into the Aggregate Pool and at minute seven, Motoclick starts to lose money. Needless to say, this is not economically feasible for a small company like Motoclick.

8

Importantly, as noted, no worker is entitled to any portion of the Aggregate Pool. An individual worker is only entitled to be paid for their Active Time at the minimum rate (plus tips). As stated in page 28 of the DCWP Report:

> The aggregate pay requirement is not an obligation to pay $23.82 per hour to each individual worker for the hours she works, but rather a requirement that an app's total payments to all its NYC delivery workers, divided by the total hours worked by all its NYC delivery workers, must meet or exceed $23.82 per hour. [2]
>
> While the aggregate pay requirement will be the main driver of higher pay under the rule, the individual pay requirement will provide a minimum level of protection for each worker's hourly pay in any given week.
> (emphasis added)

The Aggregate Requirement can easily lead to absurd and irrational results such as the following:

• A Motoclick worker logs into the Motoclick App for 160 hours during a month, but never accepts a single delivery for task. Motoclick will still be obligated to add $3,540.80 to the Aggregate Pool for those 160 hours even though no work was performed for Motoclick.

• Motoclick elects to distribute the Aggregate Pool by a lottery and a worker who performed just one delivery of the course of a month receives the entire Aggregate Pool and no other worker receives any funds.

• Motoclick workers, with the intent to increase the Aggregate Pool, intentionally leave their Motoclick Apps logged in for long periods of time when they are not actually working in order to drive up the size of the Aggregate Pool.

The Alternative Method

Although Motoclick does not qualify to utilize it, Plaintiff's wage regulation provides an Alternative Method for satisfying the minimum pay requirement. Under this method, a platform that achieves a utilization rate of 53% or higher for a pay period (defined as the ratio of total Trip Time for all workers during a month over the sum of

---

[2] Note that the $23.82 per hour minimum wage cited was reduced before the regulation took effect.

Total Log-In Time) may elect to pay each worker individually for their Trip Time at a higher rate equal to the standard minimum pay rate divided by 0.60 (currently approximately $36.88 per hour based). This option is unavailable to low-volume secondary contractors such as Motoclick, and openly discriminates against those smaller platforms.

**Plaintiff Ignores the Reality of Multi-Apping**

Plaintiff, during its rulemaking process and through the present day, ignores the realities of how restaurant delivery platforms and workers actually function. Plaintiff's regulation is based upon the flawed concept that there is an exclusive relationship between a restaurant delivery platform and its workers. Plaintiff equates all gig delivery workers who register to work for a restaurant delivery platform with a delivery person employed by a restaurant such as a pizza shop, who sits around waiting for a delivery order, delivers orders and then returns to the pizza shop to wait for the next delivery. This analogy does not represent the reality of how gig workers provide services in the gig economy.

Because delivery workers are independent contractors rather than employees, they are free to make themselves available to multiple platforms at the same time and, on a continual basis, may accept work from whichever platform presents the first or the most favorable delivery opportunity. The reality is that most if not all gig delivery workers "multi-app" for at least some of time that they are working. "Multi-apping" is the common industry term used to describe the practice of simultaneously working for more than one delivery platform, such as Uber Eats, DoorDash, Grubhub and Motoclick, by staying logged into each company's platform at the same time. Motoclick is aware that at

least 60% of its delivery workers use multiple phones to simultaneously log into the Motoclick App and DoorDash or UberEats. ¶18, Chapparo Decl. Motoclick does not object to this practice since it does not consider its workers to be exclusive to Motoclick. ¶19, Chapparo Decl. Additionally, attached as Exhibits B and C to the Declaration of Paul Goodman are two declarations of Motoclick workers who state that they simultaneously use multiple platform accounts with multiple phones and that every other worker they know does the same.

Multi-apping takes several forms. Some workers simply remain logged into multiple applications while accepting orders from only one platform at a time. Others selectively pause competing platforms after accepting an order. Still others coordinate deliveries from multiple platforms along the same route when doing so is feasible. The common characteristic is that a worker's available time is not devoted exclusively to a single delivery platform. Online driver forums, industry publications and academic literature uniformly recognize multi-apping as an established feature of the app-based delivery industry. Attached Exhibit D to the Goodman Declaration is a sampler of "how to" articles on multi-apping and Reddit posts on the subject. The ubiquity of multi-apping is demonstrated by the extraordinary volume of publicly available discussions among delivery workers themselves. A simple internet search for "DoorDash multi-apping" returns thousands of results, including forum discussions, instructional articles, YouTube videos, TikTok videos, podcasts, and social media posts devoted to the subject. These materials do not merely acknowledge that multi-apping exists—they routinely instruct workers how to maximize earnings by remaining logged into multiple applications and how to coordinate deliveries from different platforms. The prevalence of

11

these discussions across independent online communities reflects that multi-apping is not an isolated or speculative practice, but a well-recognized feature of the app-based delivery industry. See, Goodman Decl Exhibit E (Google, YouTube, and TikTok search results for "DoorDash multi-apping").

During its rulemaking process, Plaintiff admitted that some multi-apping occurs and attempted to quantify it. DCWP Report p. 4.. Using data obtained from multiple delivery platforms, Plaintiff, whether intentionally trying to minimize the occurrence of multi-apping or not, concluded that workers were concurrently logged into more than one delivery platform for only approximately 17.7% of the time. DCWP Report p.5. The rational behind the Aggregate Requirement is directly tied to that 17.7% finding.

However, Plaintiff's estimate was derived via a flawed methodology which looked only for workers who were concurrently logged into multiple platforms using the same telephone number on each platform. What Plaintiff ignored was that workers who multi-app use a separate mobile phone or tablet to log into each different platform. Thus, Plaintiff's study did not consider the most common form of multi-apping, that is, when a delivery worker logs into DoorDash on one phone and Uber Eats on another phone. Thus, in Plaintiff's study, a multi-apping worker would appear as two unrelated workers rather than a single worker who is multi-apping. Consequently, Plaintiff's reported 17.7% multi-apping figure is not an accurate estimate of simultaneous multi-platform activity by workers and the entire regulation is therefore skewed and arbitrary.

This flawed methodology is particularly significant because Plaintiff relied upon the 17.7% estimate as an input into the economic analysis supporting the Aggregate Requirement. DCWP Report page 5. Since the methodology systematically failed to

12

identify workers engaged in simultaneous multi-apping across multiple devices, the resulting estimate necessarily <u>understates</u> the extent to which delivery workers divide their available time and are being paid by multiple platforms during the same work hours.

As of the present day, Plaintiff now refuses to even admit that multi-apping exists. At the July 10, 2026 discovery conference before this Court, counsel for Plaintiff asserted that multi-apping "does not happen" and cited that Uber Eats and DoorDash purportedly maintain utilization rates of approximately 80% to 90%. That assertion is difficult to reconcile with the Plaintiff's own rulemaking record which expressly recognized the existence of simultaneous multi-platform work and incorporated a 17.7% figure into its economic analysis. What Plaintiff continues to ignore, to the detriment of Motoclick and other similar situated companies, is that high utilization of one platform does not establish that the same worker is not concurrently logged into competing platforms such as Motoclick, generating On-Call Time, artificially increasing the Aggregate Pool and decreasing Motoclick's utilization rate calculation.

**Plaintiff Ignores the Reality of Apps Sharing and Rental**

Plaintiff's rulemaking also did not recognized the now wide-spread practice of sharing or renting of delivery platform accounts. Under this common arrangement, an individual who has established a delivery platform account rents that account by the week or month to another person in exchange for compensation, typically a fixed fee or a percentage of the earnings generated through the account. The individual actually performing deliveries is therefore not the person whose name, telephone number or other identifying information is associated with the account. Instead, the account functions as a revenue-producing asset that is leased to another individual rather than a means to earn a

13

living. In other occurrences, an authorized worker allows a friend to use his accounts in off hours on his off days. An individual who rents his or her account does not need to be protected by minimum wage regulations.

The commercial market for rented delivery accounts is extensively documented in publicly available news reports, online marketplaces, social media, driver forums and videos created by delivery workers themselves. A recent January 20, 2026 Business Insider article entitled "*Nearly half of gig workers sell or share accounts for driving and making deliveries*"[3] stated:

> Some independent contractors have come up with another way to make money using the apps: Selling access to those apps to other people, according to a new survey. Forty-five percent of gig workers surveyed by TransUnion said that they had either rented or sold access to a gig work account on a gig work platform

An April 2025 study by the Tech Transparency Project entitled "*For Sale on Facebook: Fraudulent Uber Driver Accounts*" found "80 Facebook groups with a combined membership of more than 800,000 users that trade in driver accounts for Uber, DoorDash, and other rideshare and delivery apps" and reported common rental pricing such as: "DoorDash account for sale for $430 or for rent at a rate of $115 every 30 days; an Uber Eats account for sale for $385 or for rent at the same $115 rate."[4]

Moreover, a simple Google search for "DoorDash or Uber Eats account renting" returns hundreds of results, including news articles discussing the practice, online discussions among delivery workers, and advertisements offering delivery-platform accounts for rent or seeking to rent such accounts. See, Goodman Decl. Exhibit F

---

[3] https://www.businessinsider.com/nearly-half-gig-workers-sold-rented-accounts-survey-security-risk-2026-1

[4] https://www.techtransparencyproject.org/articles/for-sale-on-facebook-fraudulent-uber-driver-accounts

(Google search results for "DoorDash or Uber East account renting" and representative advertisements). Further, CBS News in Los Angeles recently did a report on the practice from the point of view that it constitutes a risk to consumers[5]. These publicly available materials demonstrate that account renting is not merely anecdotal or theoretical, but a prevalent practice within the app-based delivery industry. *See,* Goodman Decl. Exhibit G.

The existence of account renting further undermines Plaintiff's analysis that assumes a one-to-one correspondence between a platform account, a telephone number and the individual performing deliveries. When delivery activity is attributed to the registered account holder rather than the individual actually performing the work, conclusions concerning worker earnings are materially distorted.

**Plaintiff Ignores The Existence of Order Stacking**

Another prevalent practice among restaurant delivery workers is "order stacking" which is when a worker picks up multiple restaurant orders from one or more different restaurants, either from the same platform or from a combination of platforms, and then delivering them sequentially along a route. By doing so, the worker can multiple his earnings, often from different platforms, for the very same period of time. Just like app-sharing and app-rentals, order stacking is another common practice that alters the actual economics of order deliveries for workers. Yet, Plaintiff did not consider this practice in its rulemaking and neither the Standard Method nor the Alternative Method account for the practice which skews the economics for both workers and the platforms.

---

[5] https://www.youtube.com/watch?v=S42e1bbo9YM

## III. ARGUMENT

### A. PLAINTIFF HAS NOT ESTABLISHED THE REQUIRED ELEMENTS FOR A PRELIMINARY INJUNCTION

**Plaintiff Has Not Demonstrated Irreparable Harm**

Plaintiff cannot demonstrate irreparable harm and therefore, Plaintiff's motion should be denied. Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction;" it requires the movant to show such injury is likely before the other elements may be considered. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). To establish irreparable harm, the moving party "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *supra*. Further, a preliminary injunction is "never awarded as of right" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Plaintiff fails to successfully allege that monetary damages would be inadequate compensation to address any alleged harm. This omission is glaring in light of the fact that the entire gravamen of Plaintiff's motion is that the Motoclick has not sufficiently paid its delivery workers in accordance with its regulations. This does not constitute irreparable harm. In the event that Plaintiff prevails, this Court can award monetary damages in the amount that Motoclick should have been paid its workers. The same is true for any fines that Motoclick might be liable to pay.

Plaintiff attempts to navigate around this glaring deficiency in its motion by contending that Motoclick is driving workers into poverty and that poverty constitutes irreparable harm. However, Plaintiff's sole demonstration that such poverty driving is

16

happening is a declaration from just one delivery worker who has worked for Motoclick for approximately four months ("Worker 1"). Worker 1's short declaration raises more question than it answers. In summary, Worker 1 states that he has earned very little by working for Motoclick and he speculates that in the future, he might not be able to pay to a yet to occur major expense. That does not constitute proof of irreparable harm, rather it is mere speculation of possible future events.

It is the omissions from his declaration that tell the true story. Worker 1 does not state that working for Motoclick was his sole source of income. He does not deny multi-apping and does not state if he has been paid by other delivery platforms or state his total income from all sources. He does not state that he work for Motoclick for 40 hours a week. He does not state whether he utilizes multiple phone numbers or devices concurrently. He does not state whether he has stacked multiple deliveries for different platforms along the same delivery route. We contend that these issues were intentionally avoided. Further, Worker 1 does not state who prepared his declaration. Notably, it was originally written in Spanish and then translated, not by an independent, certified translator, but rather by one of Plaintiff's employees who has every interest in shading the translation to best fit Plaintiff's litigation narrative.

Equally as significant is Plaintiff's failure to state that Motoclick has not paid Worker 1 the Individual Requirement nor does Worker 1 state that he has not been paid the $22.13 per hour Individual Requirement for the time that he was actively delivering orders for Motoclick. All Worker 1 alleges is that he has not been paid "enough." This is where the irrational basis of the Aggregate Requirement comes into play. By Plaintiff's own admission, Worker 1 is not entitled to any portion whatsoever of the Aggregate Pool.

17

In Plaintiff's own words "The aggregate pay requirement is not an obligation to pay $23.82 per hour to each individual worker for the hours she works." DCWP Report p. 28. Further, Plaintiff has stated that Motoclick would be free to divide the Aggregate Pool in any way it decides and no worker is guaranteed any portion of the Aggregate Pool. ¶3, Goodman Decl. Therefore, if Worker 1 has been paid in accordance with the Individual Requirement he faces no possible irreparable harm since he is not entitled to be paid any amount over the Individual Requirement.

**Plaintiff Motion Seeks its Ultimate Relief.**

Plaintiff's motion also should also be denied because the mandatory injunction it seeks would essentially grant Plaintiff the ultimate relief it seeks which as stated in its June 24, 2026 the "shuttering of Motoclick. Thus, the mandatory injunction would do far more than merely preserve that status quo. Rather, it would convert this action into a series of lengthy contempt proceedings brought by Plaintiff seeking sanctions based on claims of Motoclick's non-compliance with an injunction. In the Second Circuit, a preliminary injunction is properly denied when it would grant the plaintiff the ultimate relief sought in the lawsuit, as such relief is an improper substitute for a final judgment. T*om Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995).

Southern District of New York courts frequently rely on this precedent to deny injunctions that alter the status quo so drastically that a trial on the merits would become effectively moot. *See 200 E. 84th St. Owners, Inc. v. Salomone & Co.*, No. 89-CV-5035, 1989 WL 111105, at *2 (S.D.N.Y. Sept. 20, 1989). Further, "the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify

18

an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings. *Hodgson v. Corning Glass Works,* 474 F.2d 226 at 236-37 (2d Cir.1973), *aff'd,* 417 U.S. 188.

Additionally, it is submitted that Plaintiff's attempt to short circuit this litigation with a mandatory injunction is driven by Plaintiff's stated agenda of driving Motoclick out of business. On January 15, 2026, New York City Mayor Zohran Mandami held a press conference to announce the commencement of this action in coordination with two non-City workers rights organizations – Worker's Justice Project and Los Deliveristas Unidos (the "Press Event"). At the Press Event, NYC Department of Consumer and Worker Protection Commissioner Sam Levine, stated, referring to Motoclick, that "we will shut down their operation in New York City." (Goodman Decl. Ex. H at 11:56). Then, later at the Press Event, Mayor Mandami stated that the City was trying to "trying to shut down the operation." (Goodman Decl. Ex. H at 21:16). Motoclick respectfully submits that Plaintiff's motion is the mechanism via which it is trying to quickly accomplish this purely political goal while attempting to cut off the Motoclick from defending itself at a trial. Add to this Plaintiff's June 24, 2026 which announces Plaintiff's true intent and belies every statement made by Plaintiff in its motion.

**Plaintiff's Six-Month Delay Shows That No Irreparable Harm Exists**

Additionally, Plaintiff waited six months after the commencement of this action to bring its motion for a preliminary judgment, and then filed a motion rather than seeking an Order to Show Cause. Plaintiff's claim of imminent, irreparable harm is severely undermined by this six-month delay in seeking preliminary relief. See *Citibank, N.A. v.*

19

*Citytrust, 756 F.2d 273,* 276 (2d Cir. 1985) (waiting 10 weeks before seeking preliminary injunction undercuts claims of "urgent need").

### B, PLAINTIFF'S AGGREGATE PAY REQUIREMENT IS UNCONSTITUTIONAL AS APPLIED AND THEREFORE, PLAINTIFF CANNOT DEMONSTRATE LIKELIHOOD OF SUCCESS ON THE MERITS AND DEFENDANT'S CROSS-MOTION SHOULD BE GRANTED

In its cross-motion, Motoclick challenges only the Aggregate Requirement. Motoclick does not challenge the Plaintiff's authority to enact minimum-pay protections for restaurant delivery workers, nor does it seek to relitigate prior facial challenges to the wage regulations. Rather, Motoclick brings a narrowly tailored as-applied substantive due process challenge to the aggregate-payment requirement.

Motoclick is likely to succeed on the merits of its as-applied constitutional challenge to the Aggregate Requirement of 6 RCNY § 7-810(b)(2). The following discussion which demonstrates Motoclick's likelihood of success on the merits also serves as Motoclick's opposition to Plaintiff's attempt to show likelihood of success for its injunction application.

**The Aggregate Pay Requirement of 6 RCNY § 7-810(b)(2) Lacks a Rational Basis as Applied to Small, Low-Utilization Platforms and Therefore Violates Substantive Due Process and Equal Protection.**

While Plaintiff clearly intended to improve the earnings of restaurant delivery workers by adopting the minimum pay regulations, Plaintiff's rulemaking employed an unsophisticated and out-of-date view of the restaurant delivery industry and thus, produced rules which do not reflect the realities of how the mechanics and economics of restaurant deliveries actually work. Yet, Plaintiff clings steadfastly to its outdating, unrealistic and irrational regulations and aggressively tries to enforce them.

Economic regulations are subject to rational-basis review and will be struck down if they are not rationally related to a legitimate governmental purpose. *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313–14 (1993). Review, though deferential, is not toothless; a provision fails when the means chosen bear no reasonable relationship to the asserted ends or rest on grounds wholly irrelevant to achieving them. *Mathews v. de Castro*, 429 U.S. 181, 185 (1976). As applied to Motoclick—a small secondary delivery platform whose workers multi-app primarily on dominant competitors—the Aggregate Requirement fails this standard.

**The Aggregate Requirement Bears No Rational Relationship to Legitimate Governmental Interests as Applied to Motoclick**

Plaintiff's asserted interests—compensating workers for waiting time and improving conditions—are not rationally furthered by the Aggregate Pool in Motoclick's circumstances. As a small secondary delivery contractor holding only approximately 2% NYC market share and operating without a customer-facing app, Motoclick functions primarily as an overflow subcontractor, receiving most of its orders only when the dominant platforms such as DoorDash and Uber Eats lack nearby available delivery workers. Motoclick's workers with the consent of Motoclick, multi-app heavily, often prioritizing the major platforms and treating Motoclick's assignments as sporadic supplements. This structural reality produces inherently lower utilization rates for Motoclick, as its workers prioritize the dominant competitors and only accept Motoclick's delivery tasks when not otherwise engaged.

By their nature, dominant customer-facing platforms such as DoorDash and Uber Eats achieve higher utilization rates because they receive direct customer orders and assign the vast majority of those deliveries to workers who are logged into their

21

platforms. The dominant competitor's high utilization directly drives down Motoclick's utilization rate because the same workers are productively engaged (and paid) by the dominant platforms during the vast majority of their working time. This creates an enormous on-call Aggregate Pool obligations for Motoclick that bears no reasonable relationship to actual work performed by the workers, or value received by, Motoclick.

Worse, the Aggregate Requirement provides <u>no offset</u> for concurrent payments those workers receive from the dominant platforms. At a recent court conference, Plaintiff's counsel stated that Motoclick is not entitled to any offset for compensation paid by competitors even while Motoclick's obligations to fund the Aggregate Pool continues to quickly accrue. That statement perfectly illustrates the irrationality which is compounded by the Aggregate Pool not reliably accomplish the Plaintiff's wage-lifting goal because no individual worker has any entitlement to a share of the Aggregate Pool. Motoclick can disburse the Aggregate Pool "using any basis of pay it chooses" (including concentrated bonuses to high performers or other lump-sum arrangements). 6 RCNY § 7-810(d). ¶3, Goodman Decl. For a small secondary platform like Motoclick, this means the obligation to fund an outsized Aggregate Pool driven by multi-apping workers who are primarily serving (and paid by) dominant competitors. This entire mechanism is thus both overbroad (forcing Motoclick to pay for time economically tied to other platforms) and under-protective (failing to ensure individualized wage improvements).

**DCWP's Underestimation of Multi-Apping Further Demonstrates Arbitrariness**

The rulemaking record reveals that DCWP attempted to account for multi-apping by applying a discount factor of 0.8471, derived from a claimed 17.7% overlap rate (based on the same phone number appearing in records across multiple companies). This

22

methodology fundamentally understates the prevalence, mechanics and impact of multi-apping and app renting. In reality, delivery workers routinely use multiple phones and different phone numbers/SIM cards for each platform to maximize opportunities and avoid detection or platform restrictions. ¶18, Chapparo Dec. Plaintiff's same phone number matching methodology therefore, by its nature, captured only a fraction of the actual occurrences of multi-apping. Motoclick is aware of multi-apping by its own workers and does not attempt to restrict it. ¶19, Chapparo Dec. Yet, this liberal attitude towards workers, if the Aggregate Requirement is not stayed, will drive the Motoclick immediately out of business. ¶24, Chapparo Dec.

By relying on this flawed metric while refusing to allow offsets for overlapping time in the Aggregate Pool mechanics, Plaintiff adopted a rule that is poorly tailored and irrational as applied to secondary platforms like Motoclick, whose Aggregate Pool is inflated by precisely the multi-apping the DCWP understated. Plaintiff's counsel has gone even further, asserting at a court conference that multi-apping "does not exist" because of the dominant platform's high utilization rates. This position is irreconcilable with the (already understated) rulemaking data, DCWP's own Report acknowledging multi-apping, and the operational reality that drives Motoclick's low utilization. The combination of methodological flaws in rate-setting and a complete failure to fully address the effect of multi-apping on the Aggregate Pool exposes the Aggregate Requirement as arbitrary. The existence of app rental and order stacking drives even a bigger wedge into the Plaintiff's rule making assumptions, and reveals the arbitrary nature and irrationality of the Aggregate Requirement.

**Plaintiff's Position and Utilization Disparity Confirm Arbitrariness**

The dominant platforms' high utilization rates are what precisely enables them to elect the Alternative Method (and pay workers for only actual time when workers are delivering food) and escape the Aggregate Pool altogether, while the very same dynamic condemns small companies like Motoclick to the unsustainable Standard Method burden. The regulation, which systematically disadvantages new or secondary entrants on the basis of market position created by the incumbents' success, is therefore irrational. *See, FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (rational-basis review requires a reasonable relationship between the classification and the governmental purpose); *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (arbitrary singling out of a particular party can violate equal protection).

**Aggregate Pool Allocation Flexibility Does Not Cure the Defect**

The right to allocate the Aggregate Poll using any basis determined by Motoclick (§ 7-810(d)) does not restore rationality. Flexibility in distribution does nothing to reduce the total liability Motoclick must fund—an inflated pool driven by worker's remaining logged into the Motoclick App while performing services for its larger competitors. Additionally, since Motoclick, at its sole discretion, could give the entire Aggregate Poll to just a few, or even to just one delivery worker, the rule bears no rational relationship to the Plaintiff's goal of lifting all worker's pay.

Therefore, as applied to Motoclick, the Aggregate Requirement is not rationally related to any legitimate governmental interest. It counts overlapping multi-app time (underestimated by the Plaintiff's own flawed methodology) as a compensable burden on the secondary platforms, provides no offset for concurrent earnings from dominant

24

platforms, fails to guarantee individualized wage improvements and predictably drives small competitors out of business while favoring incumbents. The provision therefore violates substantive due process and equal protection under the Fourteenth Amendment to the U.S. Constitution and the corresponding provisions of the New York Constitution (N.Y. Const. art. I, §§ 6, 11).

**The Aggregate Compensation Requirement Is Irrational As Applied Because It Systematically Advantages Dominant Platforms While Imposing Disproportionate Burdens on Small Secondary Contractors**

Motoclick and other delivery-only platforms are significantly different kinds of businesses than the major restaurant apps. Trying to regulation them as if they were the same kind of business is irrational as applied because it allows high-utilization dominant platforms such as DoorDash and Uber Eats to avoid the far more expensive Aggregate Pool entirely by electing the Alternative Method, while small secondary contractors like Motoclick are locked into the Standard Method's Aggregate Requirement. Because the dominant platforms achieve high utilization rates through their primary customer-facing business model, they can pay only for trip time at the higher Alternative rate (approximately \$36.88 per hour) and escape the Aggregate Pool, altogether. In contrast, Motoclick's inherently lower utilization, <u>caused by the very success of the dominant platforms</u>, forces it to fund a massively inflated and business destroying Aggregate Pool. Every moment a worker delivers for a dominant player <u>increases</u> the cost borne by all smaller players simultaneously. This structure systematically disadvantages new or secondary entrants on the basis of market position created by the incumbents' success, rather than advancing any legitimate wage-protection goal in a rational or even-handed manner.

**The Aggregate Requirement Violates the Takings Clause**

In addition to violating substantive due process and equal protection, the Aggregate Requirement effects an unconstitutional regulatory taking as applied to Motoclick without just compensation in violation of the Takings Clause of the Fifth Amendment (as applied to the states through the Fourteenth Amendment). *See* U.S. Const. amend. V; U.S. Const. amend. XIV, § 1. By compelling Motoclick to pay for a massively inflated Aggregate Pool generated primarily by workers who are logged in to Motoclick's platform while serving the dominant competitors (through multi-apping), the rule forces Motoclick to subsidize labor costs properly attributable to other platforms without any meaningful nexus to its own business or deliveries. This monetary exaction destroys the economic viability of Motoclick's small secondary operation (which holds only a 2% market share and functions as overflow capacity) and interferes with its reasonable investment-backed expectations in a subcontracting model. *See Eastern Enterprises v. Apfel, 524 U.S. 498* (1998) (retroactive financial burdens); *Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. 595* (2013) (monetary exactions); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978) (considering economic impact, character of government action, and interference with investment-backed expectations). The same analysis holds under the New York Constitution. The provision therefore constitutes a taking without just compensation, providing an independent basis for enjoining its enforcement against Motoclick.

**Motoclick Faces Irreparable Harm**

If Motoclick's cross-motion is denied and Plaintiff is permitted to enforce the Aggregate Requirement, Motoclick will need to immediately shut down its business since

26

every minute that it operates will increase Motoclick's losses. ¶24, Chapparo Decl. The Second Circuit has found that a threat of the loss of a business constitutes irreparable harm. *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir. 1970), *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.,* 749 F.2d 124, 125-26 (2d Cir. 1984) (finding irreparable harm from loss of "ongoing business representing many years of effort and the livelihood of its husband and wife owners").

**Balance of the Equities Favors Plaintiff and Weighs Strongly Against Granting the City's Mandatory Injunction**

The balance of the equities tips decidedly in Motoclick's favor and against granting Plaintiff the extraordinary remedy of a mandatory preliminary injunction. Motoclick, a small secondary delivery contractor holding only approximately 2% of the NYC market, faces existential harm from continued enforcement of the Aggregate Requirement. Enforcement pending resolution of the constitutional challenge would likely drive Motoclick out of business entirely.

In contrast, Plaintiff would suffer little to no irreparable harm from a stay of enforcement against this single small player. Plaintiff's own evidence consists of a single declaration from a worker. That declaration omits any mention of multi-apping or earnings from others platforms, which are most likely the worker's primary source of income. Granting the Plaintiff's motion would effectively allow it to achieve through preliminary relief the very outcome it has publicly declared it seeks — shuttering Motoclick's business — while the constitutionality of the underlying regulation remains hotly contested. Plaintiff's press release on the filing date further reveals that its true intent is punitive and political rather than protective. A brief stay pending full adjudication of Motoclick's as-applied constitutional claims will not undermine

27

Plaintiff's broader enforcement efforts against the dominant platforms that control the overwhelming majority of the market.

The public interest likewise favors maintaining the status quo. Preserving a small secondary contractor promotes competition in a highly concentrated market and avoids the irreparable harm of driving a legitimate business out of operation based on a regulation whose validity is subject to serious constitutional challenge. Accordingly, the balance of the equities strongly supports denial of Plaintiff's motion and granting Motoclick's cross-motion for a preliminary injunction enjoining enforcement of the Aggregate Requirement against it.

### IV. CONCLUSION

For the reasons set forth herein, Plaintiff's motion should be denied in its entirety and Motoclick's Cross-Motion should be granted.

Dated : New York, New York
      July 14, 2026

<div style="margin-left:40%">

CYRULI SHANKS & ZIZMOR LLP

By: /s/ Paul Goodman

Attorneys for Defendant Patio Delivery, Inc.
420 Lexington Avenue
Suite 2320
New York, New York 10170
(212) 661-6800

</div>

28

**WORD COUNT CERTIFICATION**

Pursuant to Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, I hereby certify that the total number of words in this memorandum, excluding the caption, table of contents, table of authorities, signature block certificate of service, and this word count certification is 7,581.


/s/ Paul Goodman

_____

PAUL GOODMAN